I'll call case number 246257, United States v. Duque-Ramirez. Good morning, Your Honors. Laura Deskin on behalf of Mr. Duque-Ramirez. This question is a Bruin case about the constitutionality of 922G5. It presents two big questions. First, we have to decide, does the plain text of the Second Amendment cover Mr. Duque-Ramirez's contacts, the big conduct? The big question here is, is he a member of the people? We submit that he is. He has been here since he was six years old. He's now 35. He went to public schools. He's married to a U.S. citizen. He has U.S. citizen children. Now, he is undocumented. He is here without permission. That is true. So the question becomes, is he nevertheless a member of the people? And we submit that he is, due to the substantial ties that he created to this country through his lifetime. Can I, before you move on, what is the nature of the challenge you're bringing here? It's an as-applied challenge, right? Yes. What does that mean for purposes of your case, challenging G5? I mean, I guess to just be more specific, zooming way, way, way out, even before we engage with the specific arguments on Step 1 and Step 2, I don't see a lot of daylight between a facial challenge and an as-applied challenge in your case. We see that the district court resolved the facial challenge, then you brought a different motion on an as-applied basis. The district court incorporated by reference its reasoning from the facial challenge. So can you help me understand, confirm that this is an as-applied challenge, and then explain precisely what does that mean for purposes of your challenge to G5? Yes. We are not asking this court to find that it is unconstitutional for the legislature to disarm an undocumented, somebody who has just crossed the border, for example. I do not think that that means that that person has become a member of the people. So we're looking back as to as-applied to somebody who has created substantial ties to the country. I think that enough substantial ties to the country. I think that this court first needs to find that that is so in this case, and if that is the case, then he is a member of the people for terms of having this Second Amendment right. What about for Step 2? So for Step 2, we have to determine whether somebody like Duque, who has substantial ties to the country, has been here since childhood. Is it then in accord with our historical tradition, with the principles that underpin our historical firearm regulatory tradition? Is it, does it make sense to, is there a historical analog then that would permit him, Mr. Duque Ramirez, or people similarly situated to then disarm them? Okay, so here's where I'm confused, and it goes back to the nature of the challenge here. In the district court, you seemed to tether your as-applied challenge to the need for an individualized assessment of dangerousness for your client, and argued for that. The district court rejected that argument, and that argument, whether availing or not, made sense to me. It was a sensible way to understand your as-applied challenge. You don't argue for that anymore on appeal. You don't say anything about the need for an individualized assessment. You know, that was not purposeful. I believe that we were just continuing on with an as-applied challenge. Okay, so your position is still, even though it's not, I don't see it in your briefing on appeal. You contend the district court erred in concluding that no individualized assessment attends to a G-5 as-applied challenge here. That's correct. You didn't argue that, though. I didn't. So the government has the burden of showing what is the correct historical regulation. What is the analog? They said loyalty, loyalists. The district court agreed with that assessment, so that the fact that whether or not somebody took an oath was the historical analog. We disagree with that and continue disagreeing with that on appeal. And I do think, so you have to think about what is, what is the, has to have a similar how and a why behind it. And really, so what was the oath-taking about? What were loyalists? Why did they have that, those laws? And that's because they viewed people who refused to take an oath as dangerous. That's a good argument. You didn't make it. Well, I didn't mean to not make it. I was arguing that the court got it wrong. Like loyalty, oath-taking, and I believe I did argue on appeal that the oath-taking was not the correct. You did argue that. And I don't mean to sort of nickel and dime your presentation. It's just the way in which you understand the as-applied challenge and present it to us I think has deep significance for how we are to adjudicate this case. Because if your view is you need to do an individualized assessment for my client to determine whether it's constitutional as to him, and that's because the principle we're extracting from the historical record is one that supports disarmament based on dangerousness. Yes. So if that, but you don't connect those dots. And so I'm just not sure what's left of your as-applied challenge here, if you're not insisting that an individualized assessment is required for G-5 in your case. Well, I am asking that an individualized assessment be required. That's what we mean by an as-applied challenge. So you have it at two stages. Number one, is he a member of the people? And then if he is a member of the people, which I asked this court to find based on his substantial ties, then is disarming him nevertheless in accord with our historical tradition? The district court and the government insists that that is because the correct analog is loyalist laws, and that is the incorrect analog for, it's the why that is the problem here. And it's because, as I said before, that the reason why they were disarmed, people who refused to swear an oath, is the legislature determined or the founders determined that there is something suspect about them. So let's talk about the refusal. I'm sorry. Go ahead. Well, I was just going to say on the why, isn't it more accurate to say that historically the why was about the fact that loyalty equated with a level of trustworthiness as opposed to not being dangerous, but simply a mark of trustworthiness? And in that case, isn't that similar here? I think that it was about more than simple trustworthiness or not. It was about whether you were somebody who may be an insurrectionist, maybe a threat to the actual nation here. To pull it out so far as to say it's just about trustworthiness, then you would have to say, well, then is somebody who's been here in the country in an as-applied challenge since they were a child, without any evidence of dangerousness, then why can the legislature simply disarm them based on a hunch or feeling that they are not trustworthy? They never have a chance to prove otherwise, and somebody like Mr. Duque Ramirez has repeatedly wanted to swear an oath to this country. He's just been not permitted to. So the relevant historical laws that are, the loyalty laws that are at issue in this case, say failing or refusing. Is that an important distinction? Because refusing certainly feels like what your client, according to your position, is not doing. He's not refusing, but descriptively he has failed to take the oath, right? So if the loyalty laws that are in our record have that or, failing or refusing, how should we be thinking about that? Well, the loyalty laws each permitted a chance to swear the oath. And so I think it really is about refusal. When we don't have that here, he has no opportunity to be able to swear an oath that's denied by the government. But the loyalty laws each provided an opportunity to be able to prove and swear that you were loyal to this country. I think that the real, the principle that underpins all of this is, is this person a danger to this country? Is that why we should be, or do they have, as in Harrison, is there a, are they, do they present a future danger to this country? Well, you concede that if a person is a recent illegal, that they are not part of the people. Yes. Now, if those people are nice people and they're not breaking any laws, why do you say that they are not part of the people? I think because they have not had an opportunity to show that they have substantial ties and connections to this country. Somebody who's been here, Mr. Duque Ramirez is now 35 years old. He's been here since he was six. He's had years of opportunity to create these ties. He has them. U.S. citizen wife, U.S. citizen children, et cetera. Somebody who's just walked into the country has not demonstrated those ties. And I think that they're, they're therefore out at step one and not a member of the people. Okay. I am going to reserve the rest of my time for rebuttal. Thank you. May it please the court, Stephen Craig on behalf of the United States. The district court properly denied Mr. Duque Ramirez's motion to dismiss and found that 18 U.S.C. section 922 G5 is constitutional as applied to Mr. Duque Ramirez. In Bruin, as this court explained in Rocky Mountain Gun Owners, the Second Amendment provides a two-step balance shifting inquiry. At the first step, Mr. Duque Ramirez is the challenger, is tasked with establishing that the Second Amendment's text, as informed by history, encompasses the conduct he seeks to engage in. I'm sorry. You put the microphone. I apologize. Slow down a little. Yes, Your Honor. What I was saying is, in Rocky Mountain Gun Owners v. Polis, this court explained that at the first step, Mr. Duque Ramirez, as the challenger, bears the burden of showing that the conduct he, at this point, has engaged in is, excuse me, is consistent with the text as informed by history, which is something that Mr. Duque Ramirez has completely washed over. He's addressed nothing about what history, how history has viewed the people in the context of the Second Amendment. He relies almost exclusively on the Supreme Court's decision in Verdugo Urquidez. But whenever the Supreme Court in Heller was looking at Verdugo Urquidez, it made a couple of changes. First, Verdugo Urquidez talked about the national community and people who had formed substantial ties to make one part of the national community. When Heller addressed Verdugo Urquidez, it summarized it as talking about the political community and said nothing about forming substantial ties. As this court recognized in Huertanguizar, right after Heller was decided, it acknowledged that the Supreme Court wasn't writing between, or it didn't require reading between the lines, given the number of times that the Supreme Court addressed citizenship and tied the arms-wearing right to citizenship. I'm not asking this court to go as far as to say that the people's limited citizens, Verdugo Urquidez probably forecloses that. But I would submit that an alien who is illegally or unlawfully present is far afield of what either political community means or what- So it's your position that no matter how long a person has been in the country, as long as they're illegal, they're not part of the people? Yes, Your Honor. Period. There's no trustworthiness test. There's no any type of test to see if they're loyal. Correct, Your Honor. And that's consistent both with precedent and with history. Well, it's consistent, but is it fair? Your Honor, the question for this court isn't to determine whether the Second Amendment is fair or not. The question for this court is- Well, the question for this court is whether Mr. Duque Ramirez has shown, has met his burden of showing that he is part of the people. And in doing so, determining what the scope of the Second Amendment is. And as Rocky Mountain Gun Owners B. Polis explained, that's an inquiry that's both based on text and history. So is it the government's position that the people, the phrase the people does not mean the same thing across amendments? My position and our position first would be that, at least based on the way the precedents have developed for the Second Amendment, the court must view very closely to history. And so while another amendment may look at reasonableness, for example, the Fourth Amendment, and may look less at history, the Supreme Court has tied us very closely to history. That being said- I thought the step one of Bruin was mostly textual, no? Your Honor, Rocky Mountain Gun Owners says text as informed by history. Okay. So then it also says that we give the phrase the people the same meaning across amendments. And at the end of the day, across amendments and across the entire Constitution, I would note that I believe it's Article I, Section 2 says that the representatives shall be chosen by the people. Yet Congress, for a long period of time, has held that people who are illegally or unlawfully present aren't allowed to vote for members of the House of Representatives. And so- And the only thing I heard you say was that in Heller, which did not involve this issue, they made a comment or a straight comment about summarizing Verdugo, saying that Verdugo involved a political community. But I guess I'm- is that all you have as to why Verdugo doesn't apply? And if so, what is the meaning of that? And it seems like a red herring. Heller, the issue wasn't being considered. Well, so to start with, Verdugo or Quaidas didn't address this particular situation. Well, certainly, but it certainly has some very specific language in connection with the Fourth Amendment that would seem to be applicable here. So, Your Honor, a couple of things that I would push forth beyond Heller, but also in relation to Heller. So Heller talks about the political community. In Kirkshank, the Supreme Court explained that citizens are members of the political community. The Supreme Court had cited Kirkshank in Heller as well. But even when we get- let me raise one more Supreme Court case, Quang Hai Chu, where this court explained that an alien's identity with our society begins with mere lawful presence, and an alien starts being invested with the rights guaranteed by the Constitution when they lawfully enter and reside in the country. Beyond that, there's also United States ex-rel Turner v. Williams, which, going just to Verdugo or Quaidas, talks about in the First Amendment how an individual- if you'll give me just one second so I don't slaughter the quote- that an excludable alien is not entitled to First Amendment rights because he does not become one of the people to whom those things are secured by our Constitution by an attempt to enter forbidden by the law. And so when you add all of these together, it, I think, paints a very clear picture. But even beyond what the Supreme Court has said, if we look at history, you have the English Bill of Rights, you have Blackstone, you have Holdsworth, that all say that the right to bear arms is a right of the subject. You have Amir Battelle, who the Supreme Court has repeatedly relied on as enunciating principles of law that were applicable at the founding, who says that aliens do not participate in the rights of all citizens. I think perhaps the most persuasive is you have the states of Alabama, Arkansas, Connecticut, Kentucky, Maine, Mississippi, Pennsylvania, Tennessee, and Texas, all prior to the enactment or the ratification of the 14th Amendment, that had Second Amendment equivalents but used citizen rather than people. And I think especially Pennsylvania is perhaps the most enlightening because in 1776, in their Declaration of Rights, they used the term the people. But when they ratified their state constitution in 1790, two years before the Second Amendment was ratified, they used the term the citizens. Counsel, how should we be thinking about our decision in Hutron-Guzar in resolving this appeal? Is it the government's position that that case was abrogated by Bruin? For the most part, yes, that case was abrogated. Can you tell me exactly how? So the first part of the Second Amendment analysis in Hutron-Guzar simply said we're going to assume that the plaintext applies. It explained that the parties didn't brief the issue and that it was a large and complicated question. It concluded that the easier path to take would have been to go to the second prong that was prevailing at the time. It concluded that 922G5A was constitutional under intermediate scrutiny. The holding, that second part, was abrogated by Bruin. I think I agree with that. The first part was not, though, right? The first part was an assumption, and it was an explanation that it wasn't briefed by the parties. But Bruin, what we know from the Supreme Court, what we've learned since Hutron-Guzar, does not disturb that panel's analysis of Bruin's step one, correct? The reason I'm hesitant to fully agree with you is because I don't think there was ever an actual holding as to the first part. You're saying it was an assumption, and so it wasn't necessarily a holding. Correct. It wasn't a holding, and therefore, there was nothing to abrogate. Okay, thanks, sir. Ultimately, this is the way the Fifth and the Eighth Circuits have viewed it on the first prong. Additionally, the Fourth and the Eleventh Circuits, while not saying that individuals are not part of the people, or excuse me, have not said that illegal or unlawful aliens are not part of the people, specifically said that they fall outside of the scope of the Second Amendment. So could you, and I'm sure this is in your briefing, but could you articulate precisely what the government contends the rule should be? You said it's not citizenship. So what is the definition that we should take with the text informed by history of the people for purposes of the Second Amendment? So, Your Honor, I'm not sure I'm allowed to, I have authorization to concede a specific hard line. In this case? In this case, or more specifically in future cases. I would submit if the court wants me to speculate, without holding the government, I'm happy to offer my personal opinion. Well, I just want to know how you would like us to write this in your favor on the first prong, or the first step of Bruin. What is the holding? So the holding would be that Mr. Duga Ramirez has failed to show, or failed to satisfy his burden of showing that he or illegal alien, or illegally or unlawfully present aliens are part of the people based on text as informed by history. This court, similar to what it did in Harrison, can simply say it doesn't need to go any further than that. It doesn't need to address lawfully present aliens. It doesn't need to address lawful permanent residents. It doesn't need to address people who are here on immigrant visas rather than non-immigrant visas. These are questions that either simply don't have an issue before this court, aren't an issue before this court, or involve statutes that aren't an issue before this court. For example, 922 G5B, which deals with lawfully present aliens who are here on non-immigrant visas. You're almost out of time, and I have some more questions for you, if that's all right. Turning to the second step, what is the principle or the why that you draw from the historical loyalty laws? And specifically, is it one that sounds in dangerousness or allegiance? So, let me answer, give you the most direct answer I can, then try and flesh it out a little bit. As far as the principle, I would point the court to the principle that the 11th Circuit drew out in Hymenes Shalom, where the 11th Circuit said that an individual's undivided allegiance to the sovereign, his membership in the political community, is a precondition of the right to keep and bear arms. So, to, I think, more fully flesh that out, what history has taught us, what history has told us, is that a person owes allegiance to their native country. Here, for Mr. Duque Ramirez, Mexico. And that when a person enters into a foreign country, they continue to have that presumed allegiance. And that creates a sufficient risk of dangerousness. Okay, so that, I was wondering where this was going. If it's allegiance, and it's sort of categorical, understood categorically, not related to dangerousness, I could see how the loyalty laws here, which say fail or refuse, would support no individualized assessment of dangerousness, because that's not needed if the principle that we're looking at does not sound in dangerousness. But if it does, and it seems to me that you connect allegiance and dangerousness as the principle that we're extracting from the historical record, then why shouldn't Mr. Duque Ramirez have an opportunity on remand to show, and as applied challenge, that he is not dangerous? Well, Your Honor, if I can push back a little bit on the premise of your question, I think dangerousness is the next step. That is one of the reasons why one could be disarmed, as this court explained. In Harrison, that is a principle that can be drawn from loyalty laws, or the loyalist laws, in addition to other laws. But the narrower principle has to do specifically with loyalty and allegiance. That's something that every circuit to address this has, or excuse me, specifically the fourth, Your Honor, I see that I'm out of time. Can I finish this up? Yes, please. Specifically the fourth, seventh, and eleventh circuits have specifically addressed saying that this is an allegiance issue, and that individualization is not required. Because it has more of a categorical understanding, and that if you look at the principle that we're extracting as allegiance, it's more categorical and not individualized, right? Yes, Your Honor. If I may make one more statement. Certainly, finish up. Thank you. I just wanted to push back on one thing that Mr. Duque-Ramirez has argued, which is that he's never had the opportunity, as we've argued in our brief. Mr. Duque-Ramirez could do what the law requires, which is go through the immigration process like everyone else. Thank you. Thank you. Rebuttal.  Well, I think two things. So if allegiance is the broad-based category, and we're only basing disarmament on whether or not you have sworn an oath, that implicates many things. You have legal permanent residents who are not naturalized. They have never sworn an oath, or they have not sworn allegiance to this country, and so that would mean that they could be disarmed, don't have Second Amendment rights. People who are citizens, I have never sworn an oath beyond my federal public defender swearing to uphold the Constitution. But as a citizen, we do not necessarily swear oaths. Mr. Duque-Ramirez himself, however, grew up in Oklahoma City public schools where he no doubt pledged allegiance many, many times. That is a tradition that is still ongoing. So I think that to make it such a straight-line category, there's no individualized, you either swear an oath or you're not, is much, much too narrow for this assessment. And I think that when you, so our job is to look at history and the justifications behind the laws that existed at that time for disarming people. And in this case, the loyalty oaths, they serve, the reason behind them, again, was dangerousness. They thought that those people were a threat to the country. I believe that Mr. Duque-Ramirez has proven through his life that he is not that kind of a danger and that he should be able to make that as-applied challenge. We have other as-applied challenges available to us so far in other 922 cases, and there is not reason for this one to be different. With that, I will leave it. Thank you, Counsel. Thank you. The case will be submitted. Counsel are excused. Thank you very much for your helpful presentations.